IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| DENNIS HISLOP, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| CH2M HILL COMPANIES LTD; CH2M ) | |
| HILL COMPANIES LTD DISABILITY ) | |
| INCOME BENEFIT PLAN; and LIFE ) | |
| INSURANCE COMPANY OF NORTH ) | |
| AMERICA, ) | |
| ) | No. 3:19-cv-0073-HRH |
| Defendants. ) | |
| _____) | |

FINDINGS OF FACT and CONCLUSIONS OF LAW

        This is an action for judicial review of the termination of ERISA benefits.  Plaintiff

has timely filed his opening brief,[1] to which defendants have timely responded.[2]  Defendants

have also filed a cross-motion for summary judgment.[3]  Defendants' cross-motion is

opposed.[4]  Oral argument was not requested and is not deemed necessary.

_____

        [1]Docket No. 24.

        [2]Docket No. 31.

        [3]Docket No. 32.  "In the ERISA context, summary judgment is merely a vehicle for
deciding the case[.]"  Gilliam v. Nevada Power Co., 488 F.3d 1189, 1192 n.3 (9th Cir. 2007).

        [4]Docket No. 35.

<u>Facts</u>

Plaintiff is Dennis Hislop. Defendants are CH2M Hill Companies Ltd., CH2M Hill Companies LTD Disability Income Benefit Plan ("the Plan"), and Life Insurance Company of North American ("LINA"). Plaintiff worked for CH2M Hill as a heavy equipment operator and laborer. CH2M Hill was the sponsor and administrator of the Plan, which provided Long Term Disability ("LTD") benefits to Plan participants.[5] Plaintiff was a Plan participant. Originally, Standard Insurance was the "Claims Administrator for the LTD component of the Plan."[6] CH2M however "retain[ed] the right of final review and decision on all claims and appeals."[7] In 2014, LINA became the claims administrator.[8]

The statement of coverage for the Plan provides that "[i]f you become Disabled while covered under the Plan, we will pay LTD Benefits according to the terms of the Plan after we receive Proof of Loss satisfactory to us."[9] "Proof of Loss" is defined as "written proof that you are Disabled and entitled to LTD Benefits."[10]

---

[5]Admin. Rec. at 1331.

[6]Admin. Rec. at 1331.

[7]Admin. Rec. at 1331.

[8]Admin. Rec. at 14.

[9]Admin. Rec. at 1339.

[10]Admin. Rec. at 1355.

-2-

The Plan provides that

> You are Disabled if you meet the following definitions during
> the periods they apply:
>
>> A.    Own Occupation Definition of Disability.
>>
>> B.    Any Occupation Definition of Disability.[11]

The "own occupation" definition of disability provides that

> You are Disabled from your Own Occupation if, as a result of
> Physical Disease, Injury, Pregnancy or Mental Disorder:
>
> 1.    You are unable to perform with reasonable continuity the
>       Material Duties of your Own Occupation; and
>
> 2.    You suffer a loss of at least 20% of your Indexed
>       Predisability Earnings when working in your own
>       Occupation.[12]

"Own Occupation means any employment, business, trade, profession, calling or vocation
that involves Material Duties of the same general character as the occupation you are
regularly performing for your Employer when Disability begins."[13]  "Material Duties" are
defined as

> the essential tasks, functions and operations, and the skills,
> abilities, knowledge, training and experience, generally required

---

[11]Admin. Rec. at 1343.

[12]Admin. Rec. at 1343.

[13]Admin. Rec. at 1343.

-3-

by employers from those engaged in a particular occupation that cannot be reasonably modified or omitted.[14]

The "own occupation" period of disability is "[t]he first 24 months for which LTD Benefits are payable."[15]

The "any occupation" definition of disability provides that

You are Disabled from all occupations if, as a result of Physical Disease, Injury, Pregnancy or Mental Disorder, you are unable to perform with reasonable continuity the Material Duties of Any Occupation.[16]

"Any Occupation" is defined to

mean[] any occupation or employment which you are able to perform, whether due to education, training or experience, which is available at one or more locations in the national economy and in which you can be expected to earn at least 60% of your Indexed Predisability Earnings within twelve months following your return to work, regardless of whether you are working in that or any other occupation.[17]

The "any occupation" period is "[f]rom the end of the Own Occupation Period to the end of the Maximum Benefit Period."[18]  The Maximum Benefit Period is "[d]etermined by your age

---

[14]Admin. Rec. at 1344.

[15]Admin. Rec. at 1338.

[16]Admin. Rec. at 1344.

[17]Admin. Rec. at 1344.

[18]Admin. Rec. at 1338.

-4-

when Disability begins[.]"[19]  Plaintiff was 54 years old when his disability began, so his Maximum Benefit Period would end at age 65.[20]

The Plan provides that

> LTD benefits end automatically on the earliest of:
>
> 1.    The date you are no longer Disabled.
>
> 2.    The date your Maximum Benefit Period ends.
>
> 3.    The date you die.
>
> 4.    The date benefits become payable under any other LTD plan under which you become covered through employment during a period of Temporary Recovery.
>
> 5.    The date you fail to provide proof of continued Disability and entitlement to LTD  benefits.[[21]]

The Plan provides that the amount of LTD Benefits is "66 2/3% of the first $5000 of your Predisability Earnings, reduced by Deductible Income."[22]  "Predisability Earnings means your monthly rate of earnings from your Employer[.]"[23]  Deductible Income includes Social Security disability or retirement benefits and disability benefits received pursuant to

---

[19]Admin. Rec. at 1338.

[20]Admin. Rec. at 1338.

[21]Admin. Rec. at 1347-1348.

[22]Admin. Rec. at 1338.

[23]Admin. Rec. at 1348.

-5-

any other insurance coverage.[24]  After the first year of disability, Predisability Earnings are to be adjusted annually, "on each anniversary of your Disability[,]" based on the "Consumer Price Index for Urban Wage Earners and Clerical Workers published by the United States Department of Labor."[25]

On January 14, 2013, plaintiff was injured on the job.[26]  Plaintiff "was on the back of a truck and was opening the door with his right arm extended when the wind hit the door and forcibly abducted his right arm."[27]  Plaintiff continued to work until July 2013, when his workers' compensation claim was controverted.[28] On August 23, 2013, plaintiff filed a claim for STD benefits under the Plan, which was approved.[29]  The finding of disability was based on a June 19, 2013 examination that "revealed that [plaintiff] was unable to flex or abduct his right arm greater than 90 degrees (180 is normal)" and an MRI that "demonstrated a near complete partial thickness tear of the rotator cuff, a non-displaced tear of the labrum, arthritis, and bursitis."[30]

---

[24]Admin. Rec. at 1349.

[25]Admin. Rec. at 1359.

[26]Admin. Rec. at 1245.

[27]Admin. Rec. at 1245.

[28]Admin. Rec. at 1045-46.

[29]Admin. Rec. at 1045, 1229.

[30]Admin. Rec. at 1228.

On December 18, 2013, plaintiff's claim for LTD benefits under the Plan was approved.[31] Plaintiff was determined to be disabled under the "own occupation" definition of disability.[32] Plaintiff's LTD benefits were payable as of December 16, 2013.[33] Plaintiff was advised that his maximum benefit would be $2,883.48,[34] which was 66 2/3% of his 2013 monthly income of $4235.[35]

In February 2014, plaintiff had right-sided rotator cuff repair, which was performed by Dr. Eaton.[36]

On July 22, 2014, a case manager contacted plaintiff "for [an] update following his 7/21/14 orthopedic f/u appt."[37] The case manager noted that plaintiff "remains precluded from his medium level work activity as he continues to experience pain and restricted movement of the right shoulder s/p 2/27/14 rotator cuff repair."[38]

---

[31]Admin. Rec. at 1020.

[32]Admin. Rec. at 1228.

[33]Admin. Rec. at 1016.

[34]Admin. Rec. at 1020.

[35]Admin. Rec. at 1283.

[36]Admin. Rec. at 1245.

[37]Admin. Rec. at 1233.

[38]Admin. Rec. at 1233.

On October 11, 2014, Dr. Eaton diagnosed plaintiff with "failed right rotator cuff repair" and stated that he "[a]nticipate[d] long term, possibly permanent loss of strength and ROM in right shoulder."[39]

On September 14, 2014, Dr. Purcell completed an independent medical exam ordered by the Alaska Workers Compensation Board.[40] Dr. Purcell opined that plaintiff had "the present physical capacity to perform full-time work in a sedentary and light work fashion. He does not have the capability based upon the near full-thickness rotator cuff tear in the right shoulder to pursue either medium work, heavy work or very heavy work."[41]

In April 2015, Dr. Scoggin, an orthopedic surgeon, completed an independent medical exam ordered by the Alaska Workers Compensation Board.[42] In his June 8, 2015 report, Dr. Scoggin noted that "[a]t the time of my physical examination, [plaintiff] had limited range of motion, weakness of the right shoulder, a positive lift-off test, and positive examination findings for rotator cuff pain."[43] Dr. Scoggin also noted that plaintiff's "MRI scan demonstrated medial subluxation of the biceps tendon with a probable partial tear of the subscapularis. These two findings often go together and explain his pain and need for

---

[39]Admin. Rec. at 1170.

[40]Admin. Rec. at 1103.

[41]Admin. Rec. at 1103.

[42]Admin. Rec. at 1244.

[43]Admin. Rec. at 1125.

-8-

additional treatment."[44] Dr. Scoggin opined that plaintiff would "benefit from additional medical care including an additional surgical procedure of the right shoulder."[45] Dr. Scoggin recommended "a repeat right shoulder arthroscopy" and "[d]epending upon the arthroscopic findings, a surgical biceps tenodesis with possible repair of the subscapularis would be appropriate."[46] Dr. Scoggin also indicated that "[a] right shoulder distal clavicle resection would . . . be appropriate and should be considered as a part of the repair. . . ."[47] Dr. Scoggin opined that plaintiff was "limited from heavy lifting with the right arm, overhead reaching, and heavy tool use."[48] Dr. Scoggin opined that plaintiff was "not able to work as a roustabout or truck driver at the present time" nor was he "capable of returning to work as an operating engineer."[49] Dr. Scoggin opined that "Mr. Hislop is capable of self-employment as a President of a company, according to the description provided."[50] Dr. Scoggin opined that "[f]ollowing appropriate treatment including surgical care discussed above, it is probable

---

[44]Admin. Rec. at 1125.

[45]Admin. Rec. at 1115.

[46]Admin. Rec. at 1115.

[47]Admin. Rec. at 1115.

[48]Admin. Rec. at 1118.

[49]Admin. Rec. at 1118.

[50]Admin. Rec. at 1129. Plaintiff had reported at some point that he was the "COE of his own company where he was inventing equipment for Golfing" but that "[t]his business did not pan out due to the limited access to the market here in Alaska." Admin. Rec. at 700.

that Mr. Hislop should be able to return to full-duty work as an operating engineer or truck driver, without restrictions[.]"[51]  Dr. Scoggin noted that he "would anticipate medical stability approximately 8-10 months after the date of the right shoulder surgical procedure, assuming a good outcome."[52]

On July 2, 2015, LINA "completed [its] review" of plaintiff's "ongoing benefits beyond December 16, 2015" and based on that review, determined that plaintiff's LTD "benefits will continue at this time."[53]

On October 16, 2015, plaintiff's worker's compensation claim was settled by way of compromise and release, which provided a $95,000 payment to plaintiff, a withdrawal of the controversion of benefits as to future medical expenses, and an authorization for Dr. Robert Hall to perform right shoulder surgery.[54]

On June 7, 2016, plaintiff had right shoulder surgery performed by Dr. Hall, consisting of a right shoulder open biceps tenodesis, a right shoulder open Mumford, and a right shoulder arthroscopic limited debridement.[55]

---

[51]Admin. Rec. at 1118.

[52]Admin. Rec. at 1127.

[53]Admin. Rec. at 1364.

[54]Admin. Rec. at 955-956.

[55]Admin. Rec. at 935.

On August 11, 2016, Dr. Hall noted that plaintiff was making "slow, gradual progress" and was "able to demonstrate active forward flexion about 120 degrees, active abduction about 100 degrees."[56] Dr. Hall noted that he thought plaintiff "will always have some symptoms, but overall I think he is doing well for one month postop."[57]

On September 8, 2016, plaintiff reported that he was "making reasonable progress" and on exam by Dr. Hall, he was "able to demonstrate active forward flexion about 120 to 130 degrees, abduction about 100 degrees."[58]

On October 6, 2016, plaintiff reported that "he has continued to make slow progress. He still has significant pain."[59] On exam by Dr. Hall's PA, plaintiff was "able to demonstrate active forward flexion to about 125°. Abduction is to about 110°. Internal rotation is to the thoracic spine. External rotation is appropriate."[60]

On November 8, 2016, Dr. Hall's PA noted that plaintiff was "definitely improved since my previous visit with him" and the plan was for plaintiff to "continue his physical therapy for three times a week for an additional four weeks."[61]

---

[56]Admin. Rec. at 920.

[57]Admin. Rec. at 920.

[58]Admin. Rec. at 918.

[59]Admin. Rec. at 916.

[60]Admin. Rec. at 916.

[61]Admin. Rec. at 914.

-11-

On February 16, 2017, Dr. Hall noted that "I think full recovery will probably take [plaintiff] at least a year from the procedure. For now, as long as he is making progress we would have him continue with physical therapy. . . ."[62]

On April 14, 2017, on examination by Dr. Hall, plaintiff was

> able to demonstrate active forward flexion about 140, abduction about 130 may be a little more, internally rotates about L2 or 3. Motor testing of his rotator cuff he has got good strength with minimal tenderness. He has normal contour of the biceps muscle with resisted elbow flexion and forearm supination.[[63]]

Dr. Hall noted that he thought

> with both of [plaintiff's] shoulders being a problem[[64]], it is very likely that he would be unable to ever return to heavy physical labor. I think job retraining, if its [sic] available to him, would be his best route. As far as his [right] shoulder, I think it is going to be a while yet before he reaches maximum medical improvement and he can have an impairment rating. For now, he will continue physical therapy.[[65]]

On July 27, 2017, Dr. Hall completed a Physical Ability Assessment.[66] Dr. Hall opined that plaintiff had no restrictions as to sitting, standing, walking, reaching below the

---

[62]Admin. Rec. at 912-913.

[63]Admin. Rec. at 910.

[64]Plaintiff had left shoulder surgery in 2000, 2006, and 2008. Admin. Rec. at 1059.

[65]Admin. Rec. at 911.

[66]Admin. Rec. at 899-900.

-12-

waist level, fine manipulation, and simple grasping; could frequently reach at desk level; and could occasionally reach overhead, grasp firmly, and lift/carry 10 pounds.[67]

On July 28, 2017, Dr. Hall's PA noted that "Workmen's Comp denied his PT the last time he saw Dr. Hall on 4/14/2017, so he has taken a huge decline in range of motion and pain."[68] The PA noted that she did not "think he is returning to physical labor."[69]

On August 9, 2017, Dr. Seiferth, a specialist in Occupational Medicine, reviewed plaintiff's claim file.[70] Dr. Seiferth agreed with Dr. Hall's assessment of limitations, finding that Dr. Hall's opinion was "well supported by medically acceptable clinical or laboratory diagnostic techniques and [was] consistent with the other substantial evidence in the claim file."[71]

On August 15, 2017, Darci Bakos, a Vocational Rehabilitation Specialist, completed a Transferable Skills Analysis (TSA).[72] On this TSA, plaintiff's Predisability Earnings were listed as $4325.22 per month, with the 60% requirement listed as $2595.13.[73] Bakos determined that a person with the limitations assessed by Dr. Hall could work as a gate guard,

[67]Admin. Rec. at 899-900.

[68]Admin. Rec. at 903.

[69]Admin. Rec. at 904.

[70]Admin. Rec. at 257-258.

[71]Admin. Rec. at 258.

[72]Admin. Rec. at 892-893.

[73]Admin. Rec. at 892.

-13-

earning a monthly wage of $2698.33, or a small products assembler, earning a monthly wage of $2940.[74] Both positions were listed as sedentary jobs.[75]

On August 16, 2017, LINA advised plaintiff that "[a]fter completing our review of your claim, we are unable to continue paying [LTD] benefits beyond August 16, 2017."[76] The denial was based on the "any occupation" definition of disability.[77] Relying on Dr. Hall's July 27, 2017, physical abilities assessment and the "Transferable Skills Analysis performed by" Bakos, LINA determined that there were other occupations that plaintiff "could perform given your limitation[s], education, and training/experience[,]" including gate guard and small products assembler.[78]

On October 23, 2017, plaintiff appealed the termination of his LTD benefits.[79] Attached to this appeal was a September 22, 2017 note from Dr. Hall, stating that plaintiff was "being referred to physical therapy for 1 more month then work hardening for an[]

---

[74]Admin. Rec. at 893.

[75]Admin. Rec. at 893.

[76]Admin. Rec. at 1512.

[77]Admin. Rec. at 1516.

[78]Admin. Rec. at 1516.

[79]Admin. Rec. at 888-889.

-14-

additional six weeks."[80] Dr. Hall also stated that "[f]rom an orthopedic standpoint," plaintiff should "remain off work while attending work hardening."[81]

As part of its consideration of plaintiff's appeal, LINA had Dr. Frentz, a Board Certified orthopedic surgeon, review plaintiff's medical records.[82] On February 21, 2018, Dr. Frentz opined that plaintiff was not "functionally limited. The records do not support that the claimant had ongoing post-operative issues which would be functionally limiting."[83] Dr. Frentz found that "[t]here were no clinical records as of 08/17/17 to the present to suggest the need for ongoing work restrictions and/or limitations."[84]

LINA also had Dr. Smith, who was Board Certified in Occupational Medicine, review plaintiff's medical records.[85] On February 28, 2018, Dr. Smith opined that plaintiff was "mildly functionally limited by his right shoulder condition."[86] Dr. Smith opined that plaintiff would have the following specific limitations:

> Standing -- unrestricted
> Walking -- unrestricted

---

[80] Admin. Rec. at 890.

[81] Admin. Rec. at 890.

[82] Admin. Rec. at 875.

[83] Admin. Rec. at 875.

[84] Admin. Rec. at 875.

[85] Admin. Rec. at 878.

[86] Admin. Rec. at 878.

-15-

Lifting -- occasional up to 25 pounds, and frequent up to 15 pounds

Carrying -- occasional up to 25 pounds, and frequent up to 15 pounds

Pushing -- occasional up to 25 pounds, and frequent up to 15 pounds

Pulling -- occasional up to 25 pounds, and frequent up to 15 pounds

Climbing stairs -- unrestricted

Stooping -- unrestricted

Kneeling -- unrestricted

Crouching -- unrestricted

Crawling -- unrestricted

Sitting -- unrestricted

Reaching at waist/desk level -- frequent

Reach above shoulder level -- occasional

Reach below waist level -- occasional

Use lower extremities for foot controls -- unrestricted

Fine manipulation -- frequent

Simple and firm grasping -- frequent[87]

On March 8, 2018, William Boyd IV, a rehabilitation specialist, completed a Transferable Skills Analysis.[88] On this TSA, plaintiff's Predisability Earnings were listed as $4420.81 per month, and the 60% requirement was listed as $2652.49 per month.[89] Boyd determined that a person with the limitations assessed by Dr. Smith could work as a small

---

[87]Admin. Rec. at 878.

[88]Admin. Rec. at 871.

[89]Admin. Rec. at 871.

products assembler, with earnings of $2940 per month, or a route delivery clerk, with earnings of $3139.17 per month.[90]  Both of these jobs were listed as light work.[91]

On March 21, 2018, LINA denied plaintiff's appeal.[92]  LINA noted that plaintiff's

> benefit start date was December 16, 2013, with benefits paid through August 16, 2017.  Please note that the definition of disability changed on December 16, 2015, and to remain eligible for ongoing benefits, we must have medical information that clearly supports restrictions and limitations that would prevent you from performing any occupation.[[93]]

LINA explained that on appeal, plaintiff's file was reviewed by "Dr. Bryan Frentz, Board Certified in Orthopedic Surgery and Dr. Kevin Smith, Board Certified in Occupational Medicine."[94]  "Dr. Frentz opined that review of the medical information did not demonstrate measured weakness or loss of range of motion.  He noted tenderness to palpation at the shoulder, however Dr. Frentz did not feel your post-operative conditions were functionally limiting, requiring restrictions or limitations."[95]  "Dr. Smith noted you are mildly functionally impaired, limited by your right shoulder condition.  []Dr. Smith noted decreased range of motion and tenderness to both palpation and movement which would limit your ability to

---

[90]Admin. Rec. at 872.

[91]Admin. Rec. at 872.

[92]Admin. Rec. at 1479.

[93]Admin. Rec. at 1481.

[94]Admin. Rec. at 1483.

[95]Admin. Rec. at 1483.

-17-

handle materials."[96]  LINA further explained that it had "requested [its] vocational department . . . review the supported restrictions and limitations provided by Dr. Smith to complete a Transferable Skills Assessment.  As a result of this review, Light occupations were identified in the Houston, AK labor market.  The occupations identified include Assembler, Small Products I [and] Route-Delivery Clerk."[97]  LINA stated that these jobs "satisfy the earnings requirement of your Indexed Covered Earnings under the contract."[98]  "In summary," LINA wrote that "following review of your claim, it was determined that you are able to perform the duties of a sedentary level occupation and no longer meet the definition of disability beyond August 16, 2017."[99]  LINA noted that it was

> aware that [plaintiff had] been awarded Social Security Disability Insurance (SSDI) benefits . . . and [had] considered that fact in our claim review.  [But,] we are in receipt of more recent information than the SSA had to consider at the time of its decision.  The updated medical information we have received indicates restrictions are not supported because you are able to function at a level which shows little to no impairment.[100]

---

[96]Admin. Rec. at 1483.

[97]Admin. Rec. at 1485.

[98]Admin. Rec. at 1485.

[99]Admin. Rec. at 1485.  Somewhat inconsistently, LINA concluded that plaintiff could perform sedentary work but in its explanation, it stated that plaintiff could do light work.  But presumably if plaintiff were capable of light work, he was also capable of sedentary work.

[100]Admin. Rec. at 1485.

-18-

LINA advised plaintiff that he had 180 days in which to file a second appeal, if he wished.[101]

Plaintiff filed his second appeal on September 15, 2018.[102]  In his appeal letter, plaintiff stated that his "physicians have found him to be disabled from anything other than sedentary work, which [he] has no training or experience doing successfully."[103]  This was presumably in response to the fact that the two jobs that LINA relied on in denying his first appeal were classified as light work.  Plaintiff included with his second appeal updated medical records, including Dr. Hall's treatment notes from a May 14, 2018 visit.[104]  At that visit, plaintiff told Dr. Hall that he thought he had re-injured his <u>left</u> shoulder in a motor vehicle accident in May 2016.[105]  Plaintiff's physical exam that day showed

> a fit, pleasant 59-year-old male, in no apparent distress.  He is able to demonstrate active forward flexion, about 140 on the left, which is about 20 degrees less than the right.  His active abduction again about 130-140, again lacking maybe 20 degrees compared to the right.  He internally rotates about L5 on the left, about L1 on the right.  With motor testing of the rotator cuff, he has got good strength throughout, but has significant tenderness with resisted external rotation and supraspinatus testing.  Impingement sign is positive.[106]

---

[101]Admin. Rec. at 1485.

[102]Admin. Rec. at 657.

[103]Admin. Rec. at 658.

[104]Admin. Rec. at 855.

[105]Admin. Rec. at 855.

[106]Admin. Rec. at 856.

Dr. Hall's impression was "[r]e-tear rotator cuff left shoulder."[107] Dr. Hall indicated that surgical options for the left shoulder "would include superior capsular reconstruction . . . or a reverse total shoulder."[108]

Plaintiff also included an August 2018 Functional Capacity Evaluation (FCE), which had been completed by physical therapist, Jeff LePage.[109] Plaintiff reported to LePage that in addition to surgery on both his shoulders, he had "low back herniated discs, cervical fractures, right ankle fracture in the military in 1977, bilateral foot diabetic neuropathy for years, . . . thoracic disc bulges lower 5 vertebrae, high blood pressure . . . , and high cholesterol . . . , right knee torn meniscus and patella injury. . . ."[110] Based on two days of testing, LePage opined that plaintiff should limit waist to floor lifting to 5 pounds, shoulder-level lifting to 7.5 pounds, high lifting to less than shoulder height and no more than 10 pounds, and front carry to no more than 10 pounds; could not do elevated work; could occasionally forward bend, do standing work, climb stairs, and walk; had slight to no limitations as to crouching, kneeling, using a ladder, and sitting; should be allowed to self-limit pushing/pulling to avoid pain; had no limitations as to hand gripping; and should be

---

[107]Admin. Rec. at 856.

[108]Admin. Rec. at 857.

[109]Admin. Rec. at 662.

[110]Admin. Rec. at 671.

allowed to self-pace fine motor skills.[111]  LePage recommended that plaintiff be allowed to

self-select his walking pace and to change position as needed when sitting.[112]  LePage opined

that plaintiff was not "capable of gainful employment at this time."[113]  LePage explained this

opinion as follows:  "I think the physiologic response of his elevated heart rate substantiates

his report of right upper extremity pain.  He reports having a diagnosed tear in the rotator

cuff of the right shoulder.  He demonstrated pain behavior just sitting to perform the round

block screen."[114]

Plaintiff also included an opinion from Daniel LaBrosse, a rehabilitation specialist and

vocational expert, dated September 13, 2018.[115]  LaBrosse opined that, based on LePage's

limitations, plaintiff would be "limited to sedentary work only with no overhead reaching at

all."[116]  LaBrosse noted that from his review of plaintiff's medical and physical therapy

records, "it [was] clear that the claimant suffers from Chronic Right Shoulder pain,

limitations in Range of Movement, and Ability to stay focused and on task throughout a

---

[111]Admin. Rec. at 665-667.

[112]Admin. Rec. at 666.

[113]Admin. Rec. at 664.

[114]Admin. Rec. at 664.

[115]Admin. Rec. at 699.

[116]Admin. Rec. at 700.

-21-

normal 8 hour workday."[117]  LaBrosse also noted that plaintiff "report[ed] not being able to

sit, stand, or stay in one position for very long and says he must constantly move around to

[relieve] his chronic shoulder pain."[118]  Although LaBrosse concluded that plaintiff was able

to do sedentary work based on the limitations assessed by LePage, LaBrosse opined that

plaintiff was

> unable to perform the material duties of his Regular Occupation
> as well as earn 60% or more of his Indexed Earnings with an
> occupation that he may reasonably become qualified based on
> education, training or experience.  Given the physical and
> mental limitations noted above it is highly unlikely that Mr.
> Hislop will ever again be able to maintain any type of full time
> employment in any occupation, including unskilled or semi-
> skilled occupations. . . .[119]

LaBrosse opined that plaintiff, who has a GED, had "no education, work experience and/or

training in [his] background that would qualify him" to work as a "President" of a

company,[120] as opined by Dr. Scoggin.  LaBrosse did not expressly analyze whether plaintiff

could perform the jobs of small products assembler or route delivery clerk, the two jobs

identified in LINA's initial denial of plaintiff's appeal, presumably because these were

classified as light jobs, and LaBrosse opined that plaintiff was limited to sedentary work.

---

[117]Admin. Rec. at 701.

[118]Admin. Rec. at 701.

[119]Admin. Rec. at 701.

[120]Admin. Rec. at 700.

LaBrosse also did not expressly analyze whether plaintiff could work as a gate guard, one of the jobs identified in LINA's initial termination of plaintiff's LTD benefits.

As part of its review of plaintiff's second appeal, LINA had Dr. Krouse, a Board Certified orthopedic surgeon, review plaintiff's medical records.[121]  In a report dated October 22, 2018, Dr. Krouse opined that plaintiff could sit, stand, and walk constantly; could lift/carry 20 pounds on a constant basis; could push/pull 30 pounds on a constant basis; could reach overhead occasionally; had no restrictions as to reaching at shoulder and desk level; had no restrictions as to fingering, handling, feeling, and keyboarding; had no restrictions as to crouching, crawling, or climbing stairs; should not climb ladders; and could perform driving activities on a constant basis.[122]

As part of its review, LINA also had another Transferable Skills Analysis done.  This TSA was completed on October 26, 2018 by Glenna Taylor, a Vocational Rehabilitation Specialist.[123]  On this TSA, the 60% requirement was listed as $2652.49 per month, based on adjusted Predisability Earnings of $4,420.81.[124]  Based on the limitations assessed by Dr. Krouse, Taylor determined that plaintiff could work as a small products assembler, with

---

[121]Admin. Rec. at 442.

[122]Admin. Rec. at 447.

[123]Admin. Rec. at 439-440.

[124]Admin. Rec. at 439.

monthly earnings of $3017, or a routing clerk, with monthly earnings of $3054.[125] The small products assembler position was listed as light work and the routing clerk position was listed as sedentary work.[126]

On November 1, 2018, LINA denied plaintiff's second appeal, stating that "[a]fter completing our review, we are unable to continue paying benefits beyond August 16, 2017."[127] LINA's denial was based, in part, on Dr. Krouse's report. LINA explained that

> [b]ased on the review of the medical records, Dr. Krouse determined that Mr. Hislop would require the following medically necessary work activity restrictions: sit, stand, and walk constantly; lift and carry up to 20 pounds . . . constantly; pushing and pulling up to 30 pounds constantly; reaching overhead occasionally; non load-bearing reaching at shoulder level and desk level constantly; constant fingering, handling, feeling, and keyboarding; constant crouching, crawling, or climbing activities; no climbing ladders.[[128]]

LINA explained that based on Dr. Krouse's limitations,

> a Vocational Rehabilitation Counselor reviewed the supported restrictions and determined that Mr. Hislop's functional ability would be consistent with sedentary and light levels of physical demand. The vocational specialist performed a Transferable Skills Analysis (TSA) that identified suitable occupations that

---

[125]Admin. Rec. at 439.

[126]Admin. Rec. at 439.

[127]Admin. Rec. at 1456.

[128]Admin. Rec. at 1460.

> [plaintiff] could perform, which considered his education, work
> history, and salary requirements. . . .[129]

LINA further explained that "[t]he occupations identified by the TSA include[d]" small

products assembler ($3017 per month) and sedentary routing clerk ($3054 per month).[130]

LINA noted that it was

> aware Mr. Hislop has been awarded Social Security Disability
> (SSDI) benefits by the Social Security Administration (SSA)
> and this decision is considered and given significant weight
> during our appeal review. Our office confirmed on October 3,
> 2018 that we were in receipt of all medical information to be
> considered on appeal and that we were not to request a complete
> copy of Mr. Hislop's SSA file.[131]

Plaintiff was advised that he had exhausted his administrative appeals and that he had the

right to now bring an ERISA action.[132]

Plaintiff timely commenced this ERISA action on March 14, 2019.

## Legal Standards

"In the Ninth Circuit, ERISA claims for benefits are adjudicated by a bench trial under

Federal Rule of Civil Procedure Rule ('Rule') 52(a)." Doe v. Prudential Ins. Co. of Amer.,

245 F. Supp. 3d 1172, 1174 (C.D. Cal. 2017) (citing Kearney v. Standard Ins. Co., 175 F.3d

1084, 1095 (9th Cir. 1999)). "Under Rule 52(a), the court can resolve factual issues in favor

---

[129]Admin. Rec. at 1460.

[130]Admin. Rec. at 1460.

[131]Admin. Rec. at 1460-1462.

[132]Admin. Rec. at 1462.

of either party, and it must 'find the facts specially and state its conclusions of law separately." Id. (quoting Fed. R. Civ. Proc. 52(a)).

The parties have stipulated that the standard of review in this case will be de novo.[133] Under a de novo review, the court "simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits, without reference to whether the administrator operated under a conflict of interest."[134] Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 963 (9th Cir. 2006). "When conducting a de novo review of the record, the court does not give deference to the claim administrator's decision, but rather determines in the first instance if the claimant has adequately established that he or she is disabled under the terms of the plan." Muniz v. Amec Const. Management, Inc., 623 F.3d 1290, 1295–96 (9th Cir. 2010).

"[W]hen the court reviews a plan administrator's decision under the de novo standard of review, the burden of proof is placed on the claimant." Id. at 1294. "A claimant must prove he is entitled to the benefits under his plan by a preponderance of the evidence." Filarsky v. Life Ins. Co. of N. Amer., 391 F. Supp. 3d 928, 938 (N.D. Cal. 2019). If, however, "the defending entity solely controls the information that determines entitlement"

---

[133]Docket No. 23.

[134]Plaintiff contends that LINA has a structural conflict of interest but even if that contention is correct, such a conflict of interest would have no bearing because a de novo standard of review applies in this case.

to benefits, the burden shifts to that entity. Estate of Barton v. ADT Sec. Services Pension Plan, 820 F.3d 1060, 1066-67 (9th Cir. 2016).

Discussion

Plaintiff first argues that LINA incorrectly terminated his LTD benefits because the Functional Capacity Evaluation (FCE) completed by LePage and LePage's and LaBrosse's opinions establish that he was not capable of doing even sedentary work. As set out above, LePage opined that plaintiff was not "capable of gainful employment at this time[135] and LaBrosse opined that plaintiff was "unable to perform the material duties of his Regular Occupation as well as earn 60% or more of his Indexed Earnings with an occupation that he may reasonably become qualified based on education, training or experience."[136] Plaintiff argues that these opinions, which were supported by LePage's FCE findings, are the best objective evidence of his impairments and their effect on his ability to work. Plaintiff argues that if LINA disagreed with these findings and opinions it could have conducted its own FCE or asked Dr. Krouse to comment on why he disagreed with LePage's FCE. But, plaintiff argues that it was not sufficient for LINA to simply have Dr. Krouse conduct a paper review and rely on that instead of an actual FCE.

---

[135]Admin. Rec. at 664.

[136]Admin. Rec. at 701.

-27-

Plaintiff contends that LePage's FCE findings call into question his ability to perform the "material duties" of any occupation" with "reasonable continuity[.]"[137] The Plan defines "Material Duties" as "the essential tasks, functions and operations, and the skills, abilities, knowledge, training and experience, generally required by employers from those engaged in a particular occupation that cannot be reasonably modified or omitted."[138] Plaintiff argues that LePage's FCE findings demonstrate that he has significant additional impairments beyond the upper extremity impairments which flowed from his shoulder injuries. Plaintiff contends that the FCE findings show that he has significant impairments as to standing, walking and sitting and doing fine motor tasks. LePage opined that plaintiff's "standing work is limited to his walking limitation" and that plaintiff should be allowed to "self-select his walking pace" because of "[r]eport of leg and back discomfort."[139] As for sitting, LePage opined that plaintiff should be allowed "to change position as needed for comfort" because of "report of low back pain."[140] LePage indicated that plaintiff may need to change position every 30 minutes.[141] In terms of fine motor tasks, LePage opined that plaintiff should be allowed "to self-pace fine motor tasks at waist level" because of discomfort and pain in his

---

[137]Admin. Rec. at 1344.

[138]Admin. Rec. at 1344.

[139]Admin. Rec. at 666.

[140]Admin. Rec. at 666.

[141]Admin. Rec. at 674.

shoulder and elbow.[142] Plaintiff argues that these FCE findings are the most significant evidence in this case because LePage considered all of plaintiff's limitations, rather than focusing only on limitations related to his right shoulder injury. Plaintiff argues that Dr. Krouse ignored the limitations that LePage assessed as to walking, sitting, and standing. And, plaintiff argues that LePage's assessed limitations, in particular the sitting limitation, establish that he is unable to perform sedentary work.

Plaintiff seems to interpret LePage's opinion and the FCE findings as limiting his sitting to 30 minutes per day, which would preclude even sedentary work. See Armani v. Northwestern Mutual Life Ins. Co., 840 F.3d 1159, 1163 (9th Cir. 2016) (holding "that an employee who cannot sit for more than four hours in an eight-hour workday cannot perform 'sedentary' work that requires 'sitting most of the time'"). But LePage did not opine and the FCE findings did not show that plaintiff could only sit for 30 minutes per day. What the FCE testing showed is that when plaintiff sat for 30 minutes he would shift his weight during that time.[143] The first day of testing he did so occasionally; the second day, he did so frequently and complained of low back discomfort.[144] As a result of this testing, LePage opined that plaintiff had slight to no limitations as to sitting and recommended that plaintiff be allowed

---

[142]Admin. Rec. at 673.

[143]Admin. Rec. at 674.

[144]Admin. Rec. at 674.

-29-

to change position as needed.[145]  LePage did not opine that plaintiff could not sit for more than four hours in day.  He opined that plaintiff would need to change his position every 30 minutes, which is a very different matter.

That said, plaintiff is correct that LePage and LaBrosse both opined that he would be unable to maintain gainful employment, even at a sedentary level of work.  These opinions, however, are contrary to the other medical evidence.  Dr. Purcell, Dr. Scoggin, and Dr. Hall, all of whom examined plaintiff, opined that plaintiff was capable of at least sedentary work.[146]  In addition, Dr. Seiferth, Dr. Smith, and Dr. Krouse, three of LINA's medical experts who reviewed plaintiff's medical records, opined that plaintiff was capable of performing sedentary work.[147]  While LePage was the only one who did an FCE, the limitations he assessed, according to LaBrosse, were consistent with sedentary work.[148] And even plaintiff acknowledged that he was capable of sedentary work when he filed his second appeal, stating that his "physicians have found him to be disabled from anything other than sedentary work[.]"[149]

_____

[145]Admin. Rec. at 666.

[146]Admin. Rec. at 899-900, 1103, 1129.

[147]Admin. Rec. at 258, 447, 878.

[148]Admin. Rec. at 700.

[149]Admin. Rec. at 655.

-30-

On de novo review, the court finds that plaintiff has not shown by a preponderance of the evidence that he could not perform sedentary work. The court finds that the record clearly establishes that plaintiff had the functional capacity to perform sedentary work.

But even if the record establishes that he had the functional capacity to perform sedentary work, which it does, plaintiff argues that LINA's termination of his LTD benefits was still incorrect because it is not clear that there were sedentary jobs that he could perform that would allow him to earn at least 60% of his Predisability Earnings. First of all, plaintiff contends that LINA never adjusted his Predisability Earnings. The Plan provides that after the first year of disability, Predisability Earnings are to be adjusted annually based on the "Consumer Price Index for Urban Wage Earners and Clerical Workers published by the United States Department of Labor."[150] Plaintiff contends that there is no evidence in the claims file that his Predisability Earnings were ever adjusted.

Plaintiff's contention is wrong. LINA did adjust plaintiff's Predisability Earnings. On both the March 8, 2018 TSA and the October 26, 2018 TSA, plaintiff's monthly earnings were adjusted to $4420.81.[151] According to the referral form completed for the October 26, 2018 TSA, this represented a 2.21% CPI increase "for 2013 through 2015."[152]

---

[150]Admin. Rec. at 1359.

[151]Admin. Rec. at 439 and 871.

[152]Admin. Rec. at 441.

Plaintiff next argues that his Predisability Earnings should have been adjusted through 2018, which is when LINA's termination of his LTD benefits became final. Plaintiff contends that between 2013 and 2018, the CPI-W showed a 6% increase in wages.[153] Thus, plaintiff contends that his adjusted for wage inflation Predisability Earnings for 2018 would have been $4584, 60% of which is $2750.[154]

The Plan provides that Predisability Earnings are to be adjusted "on each anniversary of your Disability[.]"[155] Plaintiff's LTD benefits began on December 18, 2013 and were terminated as of August 16, 2017. Thus, his Predisability Earnings only had to be adjusted through that date. Defendants contend, and plaintiff does not dispute, that the 2017 CPI adjustment had not taken effect by August 16, 2017; so LINA only had to adjust plaintiff's earnings for 2014, 2015, and 2016 (1.5%, .3%, and .4% respectively).[156] On de novo review, the court finds that LINA correctly adjusted plaintiff's Predisability Earnings by 2.21%.[157]

But even if his Predisability Earnings were correctly adjusted, which they were, plaintiff argues that it is not clear whether there were sedentary jobs that he could perform that would meet the 60% requirement of $2652.49. In the three TSAs, there were four jobs

---

[153]Plaintiff's Opening Brief at 4, Docket No. 24.

[154]Id. at 4 and 11 n.26.

[155]Admin. Rec. at 1359.

[156]Defendants' Combined Brief [etc.] at 16, Docket No. 32.

[157]Admin. Rec. at 441.

-32-

identified: 1) gate guard, 2) small products assembler, 3) route delivery clerk, and routing clerk. The route delivery clerk job was listed as light work, so it has no application here because plaintiff is limited to sedentary work. The small products assembler job was listed twice as light work and once as sedentary work. It is in fact light work. The Code given for this job in all three TSAs was 706.684-022. This is the Dictionary of Occupational Title code and the DOT lists the small products assembler job as light work, not sedentary work. That leaves the gate guard job and the routing clerk jobs, both of which were correctly identified as sedentary jobs.

The gate guard job was listed in the August 15, 2017 TSA with monthly earnings of $2698.33.[158] The routing clerk job was listed in the October 26, 2018 TSA with monthly earnings of $3054.[159] Both of these would appear to meet the 60% requirement of $2652.49, but plaintiff contends that there are several problems with these wage figures.

First, plaintiff argues that LINA did not provide the sources of this wage information. But, the August 15, 2017 TSA lists the source of the wage data as the 2016 Occupational Employment Statistics (OES)[160] and the October 26, 2018 TSA lists the 2018 Economic Research Institute (ERI) as the source for the wage data.[161]

---

[158]Admin. Rec. at 893.

[159]Admin. Rec. at 439.

[160]Admin. Rec. at 439.

[161]Admin. Rec. at 893.

Second, plaintiff argues that LINA improperly used Alaska wage averages in calculating whether the 60% requirement had been met rather than national wage averages. Defendants do not dispute that LINA used Alaska wage averages when determining the monthly wages for the gate guard and routing clerk jobs.

To determine whether LINA correctly used Alaska wage averages requires the court to construe the terms of the Plan. "[T]erms in a pension plan should be interpreted in an ordinary and popular sense as would a [person] of average intelligence and experience." McDaniel v. Chevron Corp., 203 F.3d 1099, 1110 (9th Cir. 2000) (citation omitted). "When disputes arise as to the meaning of one or more terms, [the court] first looks to the explicit language of the agreement to determine the clear intent of the parties." Id. "An ambiguity exists when the terms or words of a pension plan are subject to more than one reasonable interpretation." Id. "Ambiguities in the Plan are to be resolved in [plaintiff's] favor." Patterson v. Hughes Aircraft Co., 11 F.3d 948, 950 (9th Cir. 1993).

Plaintiff argues that the Plan language suggests that national wage averages should be used. Plaintiff relies on the "any occupation" definition of disability. The Plan defines "any occupation" as

> any occupation or employment which you are able to perform, whether due to education, training, or experience, which is available at one or more locations in the national economy and in which you can be expected to earn at least 60% of your Indexed Predisability Earnings within twelve months following

-34-

> your return to work, regardless of whether you are working in
> that or any other occupation.[162]

Plaintiff argues that this definition indicates that the focus is on the availability of jobs in the national economy, which means that in determining the 60% requirement, LINA should have looked to national wage averages, not Alaska wage averages. Plaintiff argues that this would be consistent with LINA's use of the national CPI-W to adjust Predisability Earnings. When LINA adjusted plaintiff's Predisability Earnings in 2017, plaintiff contends, and LINA does not dispute, that it used the national CPI-W percentages.[163] Thus, plaintiff argues that it is unfair to adjust his Predisability Earnings based on national figures but use local wages to calculate whether he could earn more than 60% of his Predisability Earnings. Plaintiff insists that national figures must be used to both adjust Predisability Earnings and determine whether the 60% requirement has been met.

The language in the Plan is not ambiguous. The Plan states that the 60% requirement is determined based on what the claimant "can be expected to earn" doing a job that the claimant is "able to perform[.]"[164] The focus is on the claimant and his situation. The reference in the "any occupation" definition to the national economy does not change this focus. In this case, the claimant is located in Alaska and he could be expected to earn what others doing the same jobs in Alaska earn. And, the TSAs focused on jobs which were

---

[162]Admin. Rec. at 1344.

[163]Admin. Rec. at 441.

[164]Admin. Rec. at 1344.

Case 3:19-cv-00073-HRH   Document 37   Filed 05/18/20   Page 35 of 38

available in plaintiff's local area, not on jobs that were generally available in the national economy.  More specifically, in the August 15, 2017 TSA, the labor market considered was Wasilla, Alaska;[165] and in the October 26, 2018 TSA, the labor market considered was Houston, Alaska.[166]  As for plaintiff's argument that it is unfair to use national CPI-W percentages to adjust Predisability Earnings and then use local wage averages to calculate the 60% requirement, it may have been more consistent for LINA to use local averages in both instances.  But LINA's failure to do so in this case would not have changed the result because the CPI-W percentages for Alaska for 2014, 2015, and 2016 do not appear to be significantly different from the national CPI-W percentages LINA used.[167]

If Alaska wage averages are used to determine whether the 60% requirement was met, LINA identified at least one sedentary job, the gate guard job, that plaintiff could perform that would allow him to earn at least 60% of his adjusted Predisability Earnings.[168]  Using Alaska wage averages, it was determined that a gate guard could earn $2698.33 per month,

---

[165]Admin. Rec. at 892.

[166]Admin. Rec. at 439.

[167]The annual CPI-W percentages of urban Alaska were 1.7%, .3%, and .1% for 2014, 2015, and 2016 respectively.  See https://data.bls.gov/timeseries/CWURS49GSA0&output_view=pct_12mths (last visited May 14, 2020).

[168]Because the court has concluded that the gate guard position would allow plaintiff to earn at least 60% of his adjusted Presdisability Earnings, the court need not consider whether the routing clerk job would also meet the 60% requirement.

-36-

which is more than the $2595.13 required in plaintiff's case.[169]  Plaintiff makes much of the fact that defendants stated that they could not produce the 2016 OES wage data which was the basis of the wage calculation for the gate guard job.[170]  Plaintiff argues that this is information that is solely within LINA's control and that defendants' failure to produce it means that defendants have failed to show that he could earn more than 60% of his adjusted Predisability Earnings.  And that means, according to plaintiff, that the court should rule against defendants and in his favor.

This argument fails, primarily because the OES wage data is readily available online.  This is not information solely in LINA's control.  The burden of proof in this case did not shift to LINA.  The burden remained with plaintiff to show, by a preponderance of the evidence, that he was entitled to continue receiving LTD benefits after August 16, 2017.

## Conclusion

On de novo review, the court concludes that plaintiff has not shown, by a preponderance of the evidence, that he was disabled under the terms of the Plan after August 16, 2017.  The court concludes that plaintiff was limited to sedentary work but that, using

---

[169]Admin. Rec. at 892-893.  The court would note that even if plaintiff were correct that his Predisability Earnings should have been adjusted through 2018, this job would meet the 60% requirement using Alaska wage averages.  Plaintiff contends that if his Predisability Earnings were adjusted through 2018, he would need to earn $2750 per month to meet the 60% requirement.  The 2018 OES Alaska-specific data for gate guards shows a mean hourly salary of $23.75.  Docket No. 30-1 at 1.  This would translate into monthly earnings of $3800, which would meet the 60% requirement of $2750, if that were the correct number.

[170]Defendants' Combined Brief [etc.] at 16, n.5, Docket No. 32.

Alaska wage averages, there was at least one sedentary job that plaintiff could perform that would allow him to earn at least 60% of his adjusted Predisability Earnings. The court concludes that LINA correctly terminated plaintiff's LTD benefits as of August 16, 2017.

The clerk of court shall enter judgment dismissing plaintiff's complaint with prejudice.

DATED at Anchorage, Alaska, this 18th day of May, 2020.

/s/ H. Russel Holland
United States District Judge

-38-